## Cornett's Ex'r v. Rice et al.

Jan. 26, 1945.

H. C. Clay for appellant.

H. C. Gillis and Robert L. Smith for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The question at issue on this appeal is, which of two mortgage liens given by J. R. Rice and wife on a house and lot in Harlan, Kentucky, is superior to the other? Both appellant and appellees finally conceded that each of their respective mortgage liens was inferior to a prior one given on the same property by the same parties to Home Owners Loan Corporation whose debt and lien was created on or prior to November 14, 1934, and which was payable in monthly installments with a precipitating clause that if any installment should be in default for

exceeding sixty (60) days the payee could declare the whole debt due and enforce the mortgage.

On November 21, 1934, Rice and wife executed a mortgage on the same property to the First State Bank of Harlan, Kentucky, to secure an indebtedness to it aggregating $4,900, but made up of three notes, one of which was for the sum of $1,500, another for $1,600 and the third one for $1,800. One of them was signed as surety by appellee, Elmer D. Hall, another by the appellee, F. F. Cawood, and the third one by Mrs. W. F. Hall. However, the mortgage given by Rice and wife to the First State Bank of Harlan expressly said that it was given to secure only $2,740.42 "of the indebtedness set out herein above;" the indebtedness set out above being the full amount of the debt of $4,900. The mortgage further said: "This mortgage is executed and delivered as additional security for said notes, or any renewal thereof not to exceed the sum of $2,740.42."

On July 26, 1939, Rice and wife executed a third mortgage on the same property to A. B. Cornett indemnifying him as their surety on several notes to different parties upon which he had to and did pay $2,672.91. Rice and wife then executed to him their note for that amount, and the mortgage they gave to him was to secure it.

Between the dates of the second and third mortgages referred to, the creditor in the first one—First State Bank of Harlan—went into liquidation under our state banking laws, with C. B. Cawood as Special Deputy Banking Commissioner to wind up its affairs. He declined to continue the renewal of the notes to secure a part of which the mortgage was given to that bank, and demanded payment of the balance due. Mrs. Hall appears to have paid the note on which she was surety, but the balance due on the notes that Elmer D. Hall and F. F. Cawood were sureties was not paid by them to the Special Deputy Banking Commissioner at that time. Instead of making payment with their own funds it was agreed between Rice and those sureties that the payment to the Deputy Banking Commissioner of the amount represented by those two notes might be made with funds borrowed from two other banks in Harlan, with notes executed by Rice with Elmer D. Hall as surety, and which was done, and the proceeds turned over to the Special Banking Commissioner. When so done, the com-

missioner entered upon the record of the original mortgage given to the defunct bank this assignment: "We hereby assign to Elmer D. Hall, F. F. Cawood and Mrs. W. F. Hall as their interests may appear, the written mortgage. This October 22, 1936," and which was signed by the First State Bank of Harlan by C. B. Cawood, Special Deputy Banking Commissioner. The same commissioner likewise assigned and transferred the notes, so partially secured by the mortgage, to the sureties on them.

In this action filed in the Harlan circuit court by Home Owners Loan Corporation it made as defendants therein A. B. Cornett and the sureties on the notes to the State Bank of Harlan, and alleged that defendants claimed some interest in the land mortgaged to him and called upon them to answer and set up their rights, if any. They filed cross-petitions against each other, i. e. the sureties cross-petitioned against Cornett and he, in turn, cross-petitioned against them, in which the only issue in this case was raised and which, as we have said, is one of priority as between the cross-petitioners.

The court upon the facts developed by the testimony—conforming to our rehearsal of them—adjudged that the lien of plaintiff in the action was superior to the other two claimed ones, and that of the sureties on the debt partially secured by the second mortgage was superior to the lien of Cornett, the holder of the third mortgage, to the extent of the amount secured by the second mortgage; and from that judgment Cornett's Executor (he having died in the meantime) prosecutes this appeal, and appellees have cross-appealed from so much of the judgment as allowed them priority for only the pro tanto amount which the mortgage stipulated that it secured—they contending that priority in their favor should have been allowed for any amount for which they were liable as sureties over and above the limited amount secured by the mortgage.

Learned counsel for appellant argues as grounds for reversal, (1) that his client was entitled to a personal judgment against J. R. Rice, but which the court did not render, (2) the appellees are not entitled to any lien because the debt to it as represented by the three notes referred to was paid, and the mortgage satisfied when the Special Banking Commissioner collected its amount in the manner hereinbefore stated, and (3) that

the assignment by the Special Deputy Banking Commissioner of both the mortgage and the notes, partially secured by it, was and is illegal, because he did not report such action to the Harlan circuit court.

Ground (1) furnishes no authority for reversal of the judgment which only determined the priority of liens created by the second and third mortgages referred to, the cause being then continued for further orders, and a personal judgment in favor of appellant against Rice may be rendered at any time after the return of the case. Ground (2) presents what we conclude to be the only material issue for our determination.

The right of superiority over the Cornett mortgage asserted by appellees, and which the trial court upheld, sprouts from the equitable doctrine of subrogation. When first promulgated by courts of equity in an effort to do justice between litigants occupying certain relations, it applied only in favor of a surety who had paid the debt of his principal. It gave the surety the benefit of any lien which the creditor held against the principal whereby he might become indemnified; but the doctrine has later been applied to other relationships than that of principal and surety. However, before the surety can enforce the right under that doctrine, so as to indemnify himself for any outlay made by him, as surety for his principal, he must have paid the debt for which he was surety. But no court has said, nor text written— so far as we have been able to discover—holding that the surety may not protect and preserve his contingent right of subrogation against junior liens, although he may not have paid the indebtedness secured by him. In a proper case calling for the application of the doctrine of subrogation, the surety has an inchoate right to the benefit of that doctrine in case he should eventually be compelled to make payment, and to deny him the right to such protection would clearly be unjust and inequitable, as well as encroaching upon the favored principle upon which the doctrine of subrogation rests. In many instances the debt of the junior lien holder matures and may be enforced, whilst, the note upon which the surety is liable may yet have considerable time to run before it matures. The surety cannot compel the creditor to accept payment, nor can the latter himself enforce payment of the debt, either from the principal or surety until it matures, which may be for years in the future,

and other creditors having inferior liens might be in a condition to enforce the collection of their debts. Unless the surety has the right in such circumstances to seek. and obtain from a court of equity the preservation of his subrogated rights, he would be without remedy, since the proceeds of the property in lien might be entirely consumed by subsequent lien holders.

A Maxim of the law is that, "There is no wrong without a remedy." Its scope and application is discussed in Broom's Legal Maxims, beginning on top page 155, star page 180 of that work. It is the law today and has been from time immemorial. There are only two methods by which rights and remedies, as recognized in the law, may be provided; one by express statute, and the other by the courts—chiefly equity tribunals—when it becomes necessary to administer justice between litigants as based on equitable principles. Long ago courts of equity in the absence of legal remedies began the enunciation of remedies whereby justice might be administered and which have continued to prevail and to be applied by the courts when necessary for the purpose indicated. A listing of them here is not necessary, but it may be said that the chest containing such equity tools has not yet been emptied. Hence the growing principles of equity are clearly recognized by all members of the profession. Our Legislature has not enacted any statute creating the right and remedy for its enforcement that is involved in this case; but it has enacted Article 2 of Chap. III, Title 8, of our Civil Code of Practice, creating and providing for the remedy of attachment, and in its section 237 a surety is given the right to attach the property of his principal before the debt which he secures becomes due, under facts which must appear from an affidavit by the surety. Following sections provide for the disposition of such actions or remedies, three of which are sections 244, 245 and 246, providing for the character of judgment to be rendered in the action. If brought by a surety against his principal, and the court finds the facts stated in plaintiff's affidavit to be true, then the judgment as prescribed in section 244 "shall be that he (principal) pay to the creditor the amount of the judgment; or, if the demand have not matured, then he (principal) so pay said amount at the time of said maturity." (Our parentheses.) Section 246 prescribes that the monies arising from such an action and which is under the control of

the court "shall be applied in satisfaction of the judgment when the demand matures, or, with the creditor's consent before it matures; and, until so applied, such money, and property of the defendant attached in the action, shall be under the control of the court." The judgment in this case (instant) conforms exactly to the Code provision last quoted. The purpose of such Code enacted remedy is to enable the surety to protect his rights as surety for his principal (defendant in such action) when the property of the latter is about to get beyond the reach of the surety.

The remedy herein approved is obtained from the reservoir of equitable remedies which equity courts may put into service when necessary to administer exact justice as based upon sound equitable principles. The Code enactment referred to parallels the equity remedy to the extent therein contained, even though no principle of the doctrine of subrogation is involved as a prerequisite to the giving of the relief. The sureties in this case seek no further relief than to be relieved of their obligation as such under facts and circumstances analogous to those prescribed in the Code remedy, i.e. to prevent the property of their principal from being applied for other purposes than the satisfaction of obligations secured by them.

This case is not the first one rendered by this court approving the conclusions we have herein reached. It was done by us in the case of Graham v. John R. Watts & Son, 238 Ky. 96, 36 S. W. 2d 859, and was re-affirmed in the case of Ruby Lumber Co. v. K. V. Johnson Co., 299 Ky. 811, 187 S. W. 2d 449.

It appears to be true that Rice was not present at the time such assignments and transfers were made by the Special Commissioner, but he acquiesced in it, ratified it and thereby waived any rights he may have had to consent to such assignments, if any; and he testified in the case that he agreed and consented to the keeping alive of the mortgage to the First State Bank of Harlan for the benefit of his sureties, the appellees. The fact that they assisted Rice in procuring the fund that was paid to the Deputy Banking Commissioner by becoming his surety to another or other banks did not have the effect to discharge the original indebtedness to the State Bank of Harlan, since appellees thereby continued as

sureties of Rice, the original principal, for such indebtedness to the subsequent lender.

We have hereinbefore said that we have found no case nor any text denying the right claimed and adjudged to the appellees in this case based upon exactly parallel facts; but this court in the case of Roberts v. Bruce, 91 Ky. 379, 15 S. W. 872, 874, had before it for determination substantially the same facts and which called for the application of the principles above referred to. In that case W. O. Bruce claimed a superior lien over the creditors of his brother, Stanley Bruce, the latter of whom had made an assignment for the benefit of his creditors. In that case one Kelly held a purchase money note against the assignee which he reduced to judgment. The defendant in the judgment in order to prevent his land being sold in satisfaction of it, procured Mrs. Kelly to assign it to his brother, W. O. Bruce, which was done, and the latter then became security for the assignee on a note to a bank for an amount sufficient to pay the judgment, and some other debts of the assignee, and with the proceeds of that note the Kelly judgment was satisfied, when it, with the note upon which it was based, was assigned by Kelly to appellee, the surety. Later the debtor, Stanley Bruce, borrowed money from S. E. DeHaven to pay the balance of the bank debt, and W. O. Bruce, his brother, became surety on that note, as well as on some notes to other parties with which to raise funds to finish paying the debt which had been executed to the bank. In the litigation to wind up the estate of the assignee this court, as well as the trial court, upheld the right of W. O. Bruce as surety for his brother, over general creditors to priority to the extent of the unpaid original indebtedness which had been created in order to procure funds to discharge the debts which W. O. Bruce incurred as surety for his brother:

Practically all of the points raised by counsel for appellant were presented in that case and decided against him. The court in its opinion, after rehearsing the facts, said:

"Upon such a state of the case it should not be held that the debt was extinguished by the payment to Mrs. Kelly. This would be inequitable. The chancellor would not listen to the debtor, Stanley Bruce, were he asking it. It was virtually a payment by the appellee under an

agreement with the debtor that the debt was to remain in force as his indemnity. The agreement was made by them in good faith, and long before the debts of the appellants were created. The obligation did not die with the payment to Mrs. Kelly, but by the agreement of the parties really in interest, then made, survived for the benefit of the appellee. It is true he did not go upon two renewals of the bank note, each lasting about six months,—the one in August, 1880, and the other in August, 1881; but thereafter he again became and was bound for it when the money was gotten of DeHaven, and also when the agreement with his brother was reduced to writing in June, 1882. It was the same debt. The Kelly note was never surrendered by him, nor was the judgment upon it ever released. In fact he remained bound all the time for the Sanford debt, and also for the Caplinger debt, until the Ricketts money was borrowed. When he again became bound for the bank debt his right to the Kelly debt as indemnity again attached by virtue of the agreement between him and his brother, it never having been surrendered.''

After further comment the court continued by saying:

``In such a case, in the absence even of an express agreement to that effect between the parties, the security should have the right to continue to hold his indemnity. His liability, although to another party, still continues; and, the money raised having been applied in payment of the original debt, his right to the indemnity should be upheld in equity. In our examination we have been able to find no case upon this point; but any other rule would be inequitable, and contrary to natural justice.''

Compare also the cases of: Jarboe, etc., v. Shively, 109 Ky. 402, 59 S. W. 328, 95 Am. St. Rep. 384; Bratcher v. Ohio County Bank's Assignee, 152 Ky. 458, 153 S. W. 950 and Davis et ux. v. Kinnard, 271 Ky. 428, 112 S. W. 2d 412.

We therefore conclude that the court did not err in adjudging the lien to which the sureties were entitled as superior to that of the Cornett mortgage to the extent of $2,740.42, the amount secured by the second mortgage. But it did not order or direct that amount paid to the sureties, but only to be impounded in the hands of the Commissioner, who in the meantime had

sold the land by directions of the court which directed that officer to pay appellees the impounded amount after they discharged the indebtedness to the other banks from which the funds had been borrowed, or to pay it to those banks when their notes matured. It, of course, adjudged that the plaintiff in the action had a prior lien and that the balance, if any, of the proceeds of sale be paid to Cornett's executor, which was insufficient to discharge the Cornett debt.

Counsel for appellant in support of ground (3), for which a reversal is sought, cites the case of Hill's Adm'r v. Dorman, Commissioner, 265 Ky. 765, 97 S. W. 2d 788. But the facts of that case are so different from those appearing in this one as to render that opinion entirely inapplicable even if it were essential to protect the lien or rights of appellees that such assignments should be so reported in order to preserve the rights of the inchoate subrogee, a question that is not necessary for us to determine. The Commissioner in making the assignment was but performing an act incident to the collecting and winding up the assets of the bank for which he was acting, and we are convinced that the statute referred to in the Hill opinion has no application to such a transaction as the assignment here involved. But under the Roberts opinion supra such an assignment was held not to be necessary in order to keep alive the lien created by the mortgage to the First State Bank of Harlan in order for the sureties of Rice to obtain the benefit of it arising under the subrogation doctrine.

If it should be insisted that none of the appellees except Hall became surety of Rice in the two banks from which the funds were procured to pay the Deputy Banking Commissioner, and therefore the other two securities, Mrs. Hall and F. F. Cawood, should not be adjudged any lien in this case, the answer is that Mrs. Hall paid cash to the Deputy Banking Commissioner in satisfaction of the note she had signed as surety to the First State Bank of Harlan, and if F. F. Cawood, the surety on the third note held by the defunct bank, signed no obligation to raise funds to pay to the Deputy Banking Commissioner winding up its affairs, then Elmer Hall and Mrs. W. F. Hall would be entitled to the priority to the extent that the court adjudged, and Cornett's executor stands in no attitude to question the distribution of the priority fund as between the ap-

pellees as sureties. The question as to the proper distribution of the fund adjudged to be paid to the three sureties raises questions to be settled between them and with which appellant has no concern.

The three sureties as appellees, moved for and obtained in this court a cross-appeal insisting thereby that the court erred in not adjudging them a prior lien over the Cornett mortgage to the extent of the entire unpaid indebtedness to the First State Bank of Harlan, or rather to the Deputy Banking Commissioner winding up its affairs. We find no merit in that contention, since the mortgage lien, through and by which the priority over Cornett's mortgage is claimed, specifies the particular amount so secured by it, and the bank to whom that mortgage was given could enforce that lien only to that extent. The court, therefore, did right in rejecting that contention of appellees' counsel. If it should be insisted that Cornett, when he obtained his mortgage, had no *actual* knowledge of the agreement between Rice and his sureties that the mortgage might be kept alive for their benefit, and because of which they became his sureties in other banks to procure funds to satisfy the Banking Commissioner in the collection of the $4,900 indebtedness to the First State Bank of Harlan, and that he was an innocent party and should not be bound by such a parol agreement, the answer is that the second mortgage was of record in the proper office, and the record contained on its margin the assignment of the mortgage above referred to. If he was bound to take notice of that record, then everything disclosed on its face likewise imputed to him knowledge. It then became his duty to inquire for what purpose, and under what circumstances the assignment had been made, all of which is in fulfillment of that principle of the law holding that one is charged with knowledge of every fact that could have been ascertained by inquiry concerning a matter about which he possesses actual knowledge, although such ascertained facts are unknown to him, but could be discovered by ordinary diligence. Cornett at the time he took his mortgage therefore knew, from the record itself, that the second mortgage above referred to had not been released or discharged and that it had been kept alive for some purpose, and it became his duty to ascertain what that purpose was. He therefore does not occupy the position of an innocent third party so as to supersede the rights of others growing

out of facts of which he had no knowledge either actual or constructive.

Wherefore, the judgment is affirmed, both on the appeal and cross-appeal.

The whole Court sitting.